MARÍA PLANELLAS DÍAZ, ETC., Plaintiff and Appellant, v. INTESTATE HEIRS OF MANUEL PLANELLAS, Defendants and Appellees.

No. 8195. Argued June 12, 1941.—Decided July 29, 1941.

*Samuel R. Quiñones* for appellant. *Luis Muñoz Morales* for appellees.

MR. JUSTICE TODD, JR., delivered the opinion of the court.

This is an action of filiation. The original complaint in this case was filed, in the District Court of San Juan, almost twelve years ago, that is, on August 28, 1929. We do not know why it was not until November 3, 1938, that a second amended complaint was filed, in which the plaintiff, María Planellas Díaz, alleged in short that Manuel Planellas Muñoz, predecessor in interest of the defendant heirs, María

Tula Pastrana and Ismael Planellas Pastrana, died at San Juan, on February 19, 1929, without having made any testamentary disposition whatsoever, his wife Mrs. Pastrana, his adopted son Mr. Manuel Planellas and his acknowledged natural daughter, María Planellas Díaz, surviving him; that about the year 1888 or 1889 her natural father Manuel Planellas Muñoz had a love affair (*relaciones amorosas*) with plaintiff's natural mother named Eduvigis Díaz, both residing at that time in the town of Cayey, Puerto Rico; that the aforesaid natural parents of the plaintiff, Manuel Planellas Muñoz and Eduvigis Díaz, were then unmarried and could have married without any impediment whatsoever; that as a result of such relations they had an only child, the plaintiff, María Planellas Díaz, who was born in the said town of Cayey, on September 11, 1889; that plaintiff's natural father, Manuel Planellas Muñoz, during the period elapsed from 1889, when the birth of plaintiff herein María Planellas took place to the time of his death, treated said plaintiff as his daughter and looked after her support and education, bestowing his family name on her publicly and in private conversations with his friends, including the defendants; that the plaintiff during her childhood and youth always lived with her above-mentioned natural father, Manuel Planellas Muñoz, who always took her out with him, and attended to her support and education, stating that she was his daughter and granting her the right to use his surname; that plaintiff continued to live with her father after the latter had contracted marriage with the plaintiff herein, María Tula Pastrana, on April 1, 1892, and took her to live at his home under the care of the above-mentioned wife and as his daughter; that on March 1, 1912, the plaintiff, with the express consent of her natural father Manuel Planellas, contracted marriage with Mauricio Verdejo, and in the marriage certificate it was stated, with the knowledge and consent of her father, that the plaintiff was an acknowledged natural daughter of Manuel Planellas Muñoz; that the plaintiff always

continued to maintain her family relations with her aforesaid father, who gave her constant help, calling and treating plaintiff's child as his grandchild; that the plaintiff, up to the time of the death of her natural father Manuel Planellas Muñoz, was in the uninterrupted possession of the status of a natural child of the said Manuel Planellas Muñoz, always maintaining uninterruptedly her family relations and constantly using the surname of her natural father, with the knowledge and consent of the latter; the plaintiff prayed for a judgment declaring her an acknowledged natural daughter of Manuel Planellas Díaz.

The defendants in their answer denied all the essential facts alleged in the complaint and by way of defense set up the following:

"1. That during the years 1888 and 1889 their ancestor Manuel Planellas Muñoz was studying in the United States.

"2. That the plaintiff on two occasions resided in the house of said ancestor and of his wife, the defendant María Tula Pastrana, where she found shelter as a servant; but she was never treated or regarded as a daughter of the said ancestor Manuel Planellas."

From a judgment dismissing the complaint on the merits, the plaintiff has appealed, and she urges that the lower court erred in holding that the evidence does not support the allegations of the complaint, in weighing the evidence, and in admitting in evidence the testimony of the defendant María Tula Pastrana, widow of Planellas. As the first two assignments refer to the weighing of the evidence by the lower court, it is necessary that we should make a summary of the same as it appears from the 400 pages covered by the transcript of the evidence.

 The evidence for the plaintiff consisted of the testimony of the witnesses Eustaquia Vázquez, Sotero Colón, Regino Rivera, Epifania Díaz, Hilaria Rivera, Ramona González, Matías Hernández, Francisco Nieves, Antonio Negrón, Mauricio Verdejo, and of her own testimony.

Eustaquia Vázquez testified that she was 75 years of age; that she has lived in Cayey all her life, and specifically from 1887 to 1890; that she intimately knew Manuel Planellas and Eduvigis Díaz, who were lovers, and María Planellas was the issue of such relations; that María was born at or about the time of the death of Baldorioty de Castro; that she remembers this well because her husband Pepe Mercado, the poet known as Momo, who left to attend the funeral of Baldorioty, "ran away from her" and never returned; that the family of Planellas objected to the relations between Eduvigis and Planellas because she was colored and he was somewhat white and that by reason of that objection "they sent him out of town," and when the child was born he was not in Cayey; that he wrote from the United States and sent money to Eduvigis; that she (the witness), at the request of Planellas, sent for the midwife when Eduvigis was in labor and also paid her fees; that the midwife, Petrona Noguera, had died; that she again saw Planellas when the latter came to Cayey to take the girl away after her mother and aunt who took care of her had died; that Planellas, while she lived, sent her gifts and paid for the care of the girl; that when her aunt died she wrote him and he came to take the girl and she turned her over to him; that she relied on another circumstance for fixing the date of the birth of María and it was that her own son was born in 1885, about four years before María Planellas; that Planellas went away from Cayey twice, and it was on the second occasion that he left Eduvigis pregnant and wrote to her from the United States. On cross-examination, she testified that Planellas worked as a clerk for Don Manuel Muñoz Callá; that Planellas visited Eduvigis, and she saw them because she was an intimate friend of Eduvigis; that the latter worked in the house of the Díaz family; that the first time that Planellas left for the United States he did not write to her, but did so after he had said relations with Eduvigis and the latter became pregnant; that Planellas left for the United States and did

not see his daughter until the latter was three years old; that when the girl was born Planellas was in the United States; that Planellas was from 20 to 22 years old at the time of his relations with Eduvigis Díaz, and the latter was 30 or 35; that Planellas told her that he was crazy about "his little negress" and that he loved her; that when he came to take the girl away he did so at night in a coach and she personally turned her over to him.

Sotero Colón testified that he was 75 or 76 years old; that he was an intimate friend of Manuel Planellas; that during the years 1888 and 1889 Planellas and he were both in Cayey; that Planellas had a love affair with Eduvigis Díaz, out of which the plaintiff María Planellas was born, whom he saw 15 or 20 days after her birth; that Planellas furnished a house for Eduvigis in the suburbs of Cidra and it was there that she became pregnant, and later he transferred her to another house in front of a bakery where he visited her because she was his concubine; that he went to the house and remained there and "there is the picture" (we suppose that the witness referred to the plaintiff); and that Eduvigis asked him (the witness) to register the girl but that he never did so. Upon being asked by the judge whether he had such a faithful memory, he answered "when things are true they are never forgotten"; that after the girl was born he did not see Planellas again for two years, when the latter returned to Cayey to get his daughter; that at the time of the childbirth of Eduvigis, he did not see Planellas in Cayey, that when Planellas went to Cayey to get his daughter, he came alone in a buggy, and on seeing him standing on a corner he greeted the witness and said to him: "Sotero, how are you?" and he answered, "How do you do, Don Planellas," and Planellas then replied, "I came to get my daughter," and he went on his way.

Regino Rivera testified that he was 80 years of age and that he had lived in Trujillo Alto ever since his birth; that

he knew Manuel Planellas and knows the defendant Tula Pastrana and the plaintiff whom they called the María Planellas girl, whose father was Manuel Planellas; that he remembered when Planellas went to Cayey to get his daughter María Planellas; that Planellas rented a buggy in town in order to go to Cayey and on his return, when bringing the girl, told him (the witness) "Nigger of mine, here is my child"; that when Planellas brought the girl from Cayey he had not yet married Tula Pastrana, which he did six or eight months afterward; that the plaintiff called Planellas her father and the latter called her his daughter; that Planellas. took her to live in the house of Pablo Asencio until he married. On cross-examination, he testified that when Planellas returned from Cayey he did not come alone with the girl in the buggy but was accompanied also by a hackman; that he did not recall the exact date on which Planellas brought the girl to Trujillo but that it was some six or eight months after he married Doña Tula and before the arrival of the Americans in Puerto Rico.

Epifania Díaz testified that she was 50 years of age; that she lived in Trujillo Alto; that at the age of 10 years she went to live at the house of Manolo Planellas, who was already married to Tula Pastrana and had a child, and where María Planellas already resided; that she (the witness) worked there as a servant; that María had room and board and ate at the table with the family; that Planellas treated María as his daughter, she called him "papa" and his wife "godmother"; that Planellas and his wife had a son who died when he was two years old; that they had no other children, but they brought a nephew to live with them; that María helped to take care of him; that she was much older than María.

Hilaria Rivera testified that she was 65 years old; that she was a neighbor of Planellas and his wife whom she knew well; that she remembered the girl María Planellas that came to live with them when she was three years of age;

that María slept in a room next to that occupied by the spouses and took her meals in the dining room; that she called Planellas "papa" and Doña Tula "godmother."

Ramona González testified that she had known María Planellas, the plaintiff, for 30 years; that she was a neighbor of Manuel Planellas in the Condado; that at that time María lived with Planellas of whom "it was said, she was his daughter"; that afterward, while living in San Juan, Planellas asked the witness' mother to take care of María for sometime as she was the cause of some quarrels with his wife; that Planellas offered to pay her mother for such care but that she never accepted anything; that her mother kept María in her house for about two years, and treated her like a daughter also; and that Planellas went to her house every week in order to bring money to his daughter; that that happened about 30 years ago; that afterward Planellas took his daughter away, but she did not know where.

Matías Hernández (a woman) testified that she was over 70 years of age and that her husband Pablo Asencio was a friend of Manuel Planellas; that Planellas took a girl named María Planellas to her house in the ward (*barrio*) of Carraizo, in Trujillo Alto, leaving her there for two or three months; that Planellas told her that that girl (pointing at the plaintiff) was his daughter; that that happened during the time of the Spanish régime; that Planellas would go to see the girl, fondle her, kiss her, and treat her as his daughter, that the girl was then about two or three years old; and afterward he took her away. On cross-examination, she testified that Planellas arrived one morning on horseback with the girl sitting on his lap; that her husband died; that her house could not be reached by coach, but by riding on horseback.

Francisco Nieves testified that he was 60 years of age and was a carpenter; that after the American invasion he went to Trujillo to the ward of Carraizo in order to repair some furniture belonging to Manuel Planellas; that at that

time there lived in the house of Planellas his wife, a girl about eight or ten years old, and a female cook; that they called the girl Mariíta and she called Planellas "papa" and his wife Doña Tula "godmother"; that Planellas would take the girl in his arms and kiss her. On cross-examination, he testified that he stayed five or six days in Carraizo working; that he knew that the plaintiff was the child that he had seen in Carraizo because he saw her in Santurce afterwards, in 1910, and he has seen her several times since, as he worked with her husband, Mauricio Verdejo.

Antonio Negrón testified that he was a friend of Planellas; that while he was a clerk in a grocery store in Santurce belonging to Don Fernando Freyre Somohano, Planellas told the owner to deliver to María Planellas anything that she ordered, as she was his daughter; that María went there every week to make purchases; that Planellas always paid them. This happened in the years 1915, 1916, and 1917.

Mauricio Verdejo testified that he was the husband of the plaintiff; that the father of his wife was Manuel Planellas; that before they were married in the year 1912 he obtained the consent of Planellas; that his children called Planellas "grandfather" without any objection on the part of the latter; that his wife called him "papa" and Planellas called her daughter; that after they were married Planellas visited his house about six or seven times; that he was a carpenter and had worked in the house of Planellas in Santurce.

María Planellas testified that she was 49 years old; that her father was Manuel Planellas; that she lived within him and called him "papa"; that Planellas was married to Doña Tula Pastrana and she called the latter "godmother"; that Planellas had a quarrel with his wife when she was fourteen years old, because one day she tried to beat her and burn her face; that when she was a small child she treated her well; that she had a room and took her meals in the dining room with her; that she lived with her father until she was 19

or 20 years old, but then, as her "godmother" mistreated her, she told her father to find a place for her to go to and she went to live with a neighbor, Mrs. Antonia González, when the latter went to live to San Juan; that she had not used any other name than that of María Planellas; that her father always treated her well and helped her, paying all her expenses and treated her as his own daughter; that she was not a servant in the house, inasmuch as she was his daughter; that her father told her that when he had come from Cayey he had taken her to the house of Pablo Asencio and afterwards to the house of María Luisa, the mother of Doña Tula, and she called the latter's father "Papa Jacinto." On cross-examination, she testified that Planellas always told her that she was his daughter and she always used his surname; that her father told her that the 11th of September was her name day and birthday; that she had lived with Planellas and his wife ever since she was four or five years old; that she had lived in Carraizo with them but that she did not remember when she lived in Quebrada Negritos because she was then a very small child; that in Carraizo Epifania Díaz worked as a servant and Manuela Flores as a washerwoman; that the defendant taught her how to do household work and she worked and helped about the house; she explained that the defendant had caused her some burns with a knife that she was cleaning with hot ashes and when her father arrived and saw her burns he had a quarrel with the defendant; that a minor surgeon treated her every day; that when they had no servant her godmother and herself did everything; that she knew Ismael, a foster child and nephew of the defendant, but that she did not take care of him because both of them were children; that before she married Verdejo she spoke to her father, and he told her that he did not agree to her marrying a colored person but that he later consented, although he was not satisfied.

Such was the evidence for the plaintiff.

That for the defendants consisted of the testimony of the witnesses María Planellas, plaintiff, Eustaquia Vázquez (the principal witness for the plaintiff), Dr. Manuel V. del Valle, Antonio Pereira, Manuela Flores, Francisco del Valle, Ramón Monge, Josefa Santi de Fernández, Félix Díaz, Rafael Font Suárez, and of the testimony of defendant María Tula Pastrana.

The plaintiff María Planellas repeated more or less what she had previously testified, but she added that according to her father, one Pancho Monge was the person who had brought her from Cayey, although she also stated that it was her father, Pablo Asencio, and the former who did so, but that she did not remember anything about that because she was very young; that the defendant is her godmother because she sponsored her confirmation in the Church of Río Piedras; that her father visited her many times after she had been married and knew his grandchildren; that she did not know of his illness and that she learned of his death on the night when he was buried.

Eustaquia Vázquez, who had already testified as a witness for the plaintiff, stated that she was 75 years of age and had always resided in Cayey; that she knew Eduvigis Díaz, the mother of the plaintiff; that Eduvigis died two years after the birth of the plaintiff and the latter stayed with an aunt; that she knew Manuel Planellas who wrote her from New York as he was her friend when he was clerk in a store; that Planellas sent her money in bills for Eduvigis, as he had left her pregnant; that Planellas left on two occasions from Cayey and that it was on the last occasion that he wrote to her from New York; she repeated that Planellas went to Cayey to get the plaintiff in a one-horse carriage with a hackman; that she did not know Pancho Monge.

Dr. Manuel V. del Valle testified that he knew Manuel Planellas intimately, as the latter was a nephew of the wife of his brother Francisco; that while he resided in New Orleans in the house of the Chevremont family, Planellas came

there to study, and that subsequently they studied together in Cecil College, in Kentucky, *from April 1887 to the month of June 1888,* when the witness graduated from the commercial course of said college and removed to Detroit in order to study in the University of Michigan, *and that he did not see Planellas again until he returned to Puerto Rico in July 1891;* that during their stay in Cecil College, Planellas and himself were roommates, and that for that reason he can assert that Planellas resided in Kentucky uninterruptedly *from April 1887 to June 1888.* On cross-examination, he testified that when he returned from the United States Planellas lived in Trujillo Alto.

Antonio Pereira testified that he was 67 years of age; that he knew Planellas in San Juan in 1884 when both were students; that in 1886 Planellas called on him one day to say good-by as he was leaving for the United States and that afterward he saw him again in the year *1890* in Trujillo Alto.

Manuela Flores testified that she was 58 years of age and lived in Río Piedras; that she worked as a washerwoman and maid for the Planellas–Pastrana spouses when the latter lived in Carraizo; that they had no other servant; she then stated that María Planellas, the plaintiff, also worked in the house as a servant, taking care of Ismael, the nephew who had been adopted by Planellas, and doing house cleaning; that María was 11 years of age and called Planellas "Don Manolo" and his wife "Doña Tula" and they called her María; that subsequently, while Planellas lived in the "Condado" she (the witness), although not working for the family, would call sometimes at the house and saw María cooking and cleaning. On cross-examination, she testified that she was the *comadre* of the defendants and that María was taken to the house of Planellas by one Domingo Monge; that after she left her employment in Carraizo she continued visiting the house of Planellas because a daughter of hers, named Paulina Flores, worked there as a servant.

Francisco del Valle testified that he was 59 years of age and was a cousin of Manuel Planellas; that he had intimate relations with Planellas when the latter lived with his wife in Santurce around 1906–1907; that he knew a girl named María while she worked there as a servant; that María called Planellas "Don Manolo" and his wife "Doña Tula" and sometimes godmother; that he never heard her call Planellas "papa."

Ramón Monge testified that he was 65 years old and resided in Trujillo Alto; that he knew the Planellas–Pastrana spouses and attended their wedding in Trujillo; that he had a brother called Francisco who lived in the town of Trujillo Alto with a concubine; that his brother, who was a professional gambler, went one day to a cockfight and brought from Cayey a girl named María and had her living in his house for about two months; that while she was there Planellas never went to see her; that two months afterward the girl went to live in the house of Pepe Asencio in the ward of Dos Bocas; that according to his opinion, when the girl arrived from Cayey she was about 4 or 5 years old; that the girl arrived in Trujillo about two years before Planellas married Doña Tula.

Josefa Santí de Fernández testified that in 1908 she spent about five months in the house of Planellas in Santurce by reason of a medical treatment she was receiving from Dr. Ashford, as she then resided in Caguas; that there was a servant called María about fifteen or eighteen years old; that said servant called Planellas "Don Manuel" and Doña Tula "godmother"; that María cooked and helped in other housework; and that there was no other servant or maid.

Félix Díaz testified that when he was 12 years old he worked as a laborer in the house of Planellas in Trujillo Alto when the latter was unmarried; that he saw the girl in the house of Pancho Monge and then the latter turned her over to Asencio, and he added that from the house of Asencio, the girl named María went to the house of Doña Luisa Cortés, the

mother of Doña Tula, and afterward, when Doña Tula had her own child, she came to the house of Planellas to help take care of that child; that María was then 5 or 6 years old. He further testified that in the house of Planellas María was treated as a servant and ate at the place assigned to the laborers.

Rafael Font Suárez testified that he knew Manuel Planellas and his wife about 1907; that he had a grocery store and the Planellas–Pastrana spouses had a charge account in his establishment; that they used to send a servant about 15 or 16 years of age named María to make purchases and that occasionally Ismael Planellas, a boy, was sent; that María called Planellas "Don Manolo" and Doña Tula "godmother".

María Pastrana, widow of Planellas, in her testimony gave a detailed account of her conjugal life with Manuel Planellas; she asserted that the girl María worked in her house in Carraizo as a servant, sweeping and helping the witness in the kitchen; that they also had another servant named Epifania; that in 1902 María again returned to her house to help take care of Ismael, whom Planellas and the witness had brought into the household and she remained there until 1904, always in the same status as a servant; that afterward, when she was 16 years of age and Planellas and the witness lived in the Condado, she returned in order to work as a cook; that she called her "godmother" because she (the witness) had sponsored her confirmation about the year 1900; that about 1910 María again left; that they adopted Ismael in the year 1920; that at the time of the last illness of Planellas, María never went to see him; that she always went from her farm in the ward of Carraizo, Trujillo, to Río Piedras on horseback and that she thought that it was not possible to make the trip in a carriage (*coche*) as the roads were in a very bad condition; that her husband did not have any carriage and that there was none in town; that she never had to repair her furniture, as she bought it when she was married and the same was sturdy and new; that the carpenter Francisco Rivera never went to her house to repair furniture.

As rebutting evidence, the plaintiff introduced the testi-mony of the witnesses Jesús Benítez Castaño and Enrique Umpierre in order to controvert the assertion made by the defendant that it was not possible to go by carriage from Trujillo to Río Piedras at the time that the Planellas spouses lived for the first time in the ward of Carraizo in Trujillo. Benítez Castaño testified that about the year 1892 it·was possible to go by carriage over a vicinal road from Trujillo to Río Piedras, although traveling on horseback and on donkeys was more frequent than traveling in a carriage; and Umpierre stated that he was the contractor who built the section of the road from Trujillo to Carraizo and that he succeeded in moving trucks loaded with materials and a steam roller through the ford of Río Grande de Loíza on that road, but that that was in 1932, and he did not know of the condition of the road prior to that time.

Besides the oral evidence, there was introduced document-ary evidence consisting of a negative certificate regarding the registration of María Díaz; a certificate regarding the marriage of Manuel Planellas Muñoz with María Tula Pas-trana, contracted in Trujillo Alto on April 1, 1893; the birth certificate of Manuel Ignacio Planellas Muñoz, born on March 16, 1867, and in addition two certificates of the Commis-sioner of Interior of Puerto Rico regarding the condition of certain roads leading to the Municipality of Trujillo Alto.

In the course of the trial, the parties stipulated that Don Román Baldorioty de Castro died on September 30, 1889, and likewise that, as the plaintiff was born in said year, this case must be governed by the 11th Law of Toro, which reads as follows:

"And in order that there may be no doubt as to who are natural children, we ordain and command that those are to be considered natural children whose fathers, at the time of their birth or conception, could marry their mothers, without the need of dispensation; pro-vided the father acknowledges him or her as his child, since he did not have in his house the woman by whom he had the child, nor was

there only one woman. For where the aforementioned conditions concur in the child, we ordain that he or she be considered a natural child.''

Nor is there any dispute between the parties as to the fact that the applicable requisites in a case where a child seeks to establish his or her filiation under said Law, are the following:

1. The child must have been born of parents who, at the time of the conception or birth, could have validly married without dispensation, and

2. He or she must have been expressly or impliedly acknowledged by the father.

However, the plaintiff amplifies her theory by maintaining that the 11th Law of Toro did not wholly abrogate the provisions of the Partidas, and that those who were natural children under the latter continued to be so regarded under the 11th Law of Toro; and she cites several commentators to the effect that once the fact that the parents lived in concubinage has been shown, it is enough to establish the status of a natural child without the necessity of proving any act of acknowledgment on the part of the father. In other words, that proof of concubinage is in itself proof of implied acknowledgment. In support of her theory the plaintiff cites the case of *Castro* v. *Solís et al.,* 19 P.R.R. 645.

In the *Solís* case, *supra,* the plaintiff argued that she had not instituted an action of filiation; for she understood that, as she had been born during the public concubinage of her mother with Solís in the latter's house at a time when both could have married, she acquired the status of an acknowledged natural child, and therefore, the action was limited to the recovery of her hereditary share. This court held as follows:

"Although according to the Roman Law it was indispensable that the concubine should live in the house of the paramour in order that a child born under such conditions should be presumed to be

the natural child of the paramour—a requisite not expressly exacted by the Partida laws—the benefits of birthright conferred by Law XI of Toro on children of women who were not actually concubines *abolished the presumption previously existing in regard to the children of concubines, and since then it is an indispensable requirement that before a child can be considered a natural child it must be acknowledged by the father expressly or impliedly.* Hence the mere fact that the plaintiff *was born* in the house of Joaquín Leandro Solís Kercado while the latter had the mother of the appellant in his house as a concubine is not in itself sufficient to give the child the status of natural child, but even under the law prior to the Law of Toro this circumstance merely established a presumption subject to proof that the facts whence such presumption originated were true; therefore, even then it was necessary to establish the facts before the courts in order that by virtue thereof the child be adjudged the natural child of the paramour, which is equivalent to bringing an action of filiation. *Under the Law of Toro cited such facts would imply a tacit acknowledgment by the father, but subject to an action of filiation.* In any event, whether such facts be considered as a presumption of the status of natural child, as is understood by appellant, *or whether they serve to prove the tacit acknowledgment, as we think, they have no further weight than to serve as proofs in an action of filiation. . . .*" (Italics ours.)

In the case of *Ramírez et al.* v. *Ramírez et al.,* 30 P.R.R. 574, that of *Castro* v. *Solís et al., supra,* was cited with approval, and it was held, quoting from the syllabus, that—

"The 11th Law of Toro does not distinguish between natural children and includes those born in concubinage; nor does that law assume that a child born of parents living together publicly as husband and wife has an established legal status *without the necessity of an action of filiation.*" (Italics ours.)

See the judgment of the Supreme Court of Spain of January 25, 1865, which was cited in the *Ramírez* case, *supra,* to the effect that the Law Toro was applicable to the acknowledgment of a child born of a concubine living in the house of the natural father and which affirmed a decision of

the lower court holding that as the mother was the concubine of the father, no acknowledgment of the child by the father was necessary.

In Louisiana the 11th Law of Toro has been similarly construed in the case of *Lange* v. *Richoux*, 6 La. 560, where it was said:

"The 11th law of Toro required that to be regarded as natural children, there should have existed at their birth no legal impediment to the marriage of the parents and that they should be acknowledged by the father, *dispensing however with any formal acknowledgement when the mother lived in the same house with the father and was his concubine.* Under this law it was considered by the ablest commentators that proof of birth was equivalent to acknowledgement on the part of the mother, *and proof of cohabitation with the mother as sole concubine tantamount to an acknowledgement of paternity.*"

Llamas y Molina, in his *Comentarios de las Leyes de Toro* (vol. 1, p. 251), referring to the 11th Law, comments as follows on the particular we are now discussing:

"Lastly, the law requires as an indispensable condition that the father should acknowledge his own child before the latter may be declared a natural child. This requisite was not demanded by the Roman Law nor was it necessary, for inasmuch as the concubine must have lived in the house of the paramour, the presumption arose in favor of the child that the latter was his natural child. As the law of Toro conferred the benefits of birthright on children of women whom the fathers had as concubines outside of their houses, the presumption arising under the Roman Law ceased and it was necessary to establish in lieu thereof the acknowledgment by the father, as observed by Mr. Covarrubias, part 2, Marriage, chap. 8, par. 4, No. 44; *from which it is inferred that when the woman lives in the house of the father, such an acknowledgment is not required.*" (Italics ours.)

The question is an interesting one and we wish that we had the necessary time to pursue and amplify the study of the same through all the commentators cited by the plaintiff. However, we think that what has been said suffices to show that the plaintiff is right in maintaining that one of the ways

to prove an implied acknowledgment by the father is by showing that at the time of the conception or birth of the child, the father lived in the same house in concubinage with the mother.

The plaintiff maintains that her evidence showed that Manuel Planellas lived in concubinage with Eduvigis Díaz, and that once this fact had been proved, it was sufficient to declare the plaintiff an acknowledged natural daughter of Planellas; but that even if this were not so, the evidence also showed acts of express or implied acknowledgment on the part of Planellas. We think that the plaintiff is right and that the lower court committed manifest error in weighing the evidence and in holding that the same did not support the allegations of the complaint.

We have summarized the whole evidence in the case and the same, in our judgment, shows that Manuel Planellas while residing in Cayey had a love affair with Eduvigis Díaz, if he did not live in concubinage with her; that when he went a second time from Cayey to the United States, he left Eduvigis pregnant and that the child María Planellas, the issue of said love affair, is the daughter of Planellas. The testimony of Dr. Manuel V. del Valle, on which the defendants and the lower court rely to maintain that Planellas was in the United States when Eduvigis became pregnant, failed to prove such a thing, despite the fact that there is no doubt that said witness testified truthfully and is worthy of full credit. Plaintiff's witness, Eustaquia Vázquez, who was also called by the defendants and whose testimony is therefore binding upon them, definitely stated that Planellas left Cayey for the United States on two occasions and that it was on his second trip that he left Eduvigis pregnant and sent her money from the United States, and that the child was born on or about the day of the burial of Baldorioty de Castro, on September 30, 1889. This witness was corroborated by Sotero Colón, who was still more explicit and testified that Planellas furnished a house for Eduvigis in

the suburbs on the highway leading to Cidra, and that he had her there as a concubine. This evidence was not controverted in any way by that of the defendants. Taking as a basis the month of September 1889, when the plaintiff was born, the conception must have taken place at most 10 months before, that is, in December 1888. What does Dr. del Valle tell us as to the stay of Planellas with him in Cecil College? That Planellas arrived in New Orleans in March or April 1887, and that subsequently they went together to Cecil College where both stayed until the month of June 1888, when Dr. del Valle went to Michigan to study, and he did not see Planellas again until he returned to Puerto Rico in the year 1891. So that neither Dr. del Valle nor any other witness for the defendant tells us where Planellas was during the period from June to December, 1888. The fact that Dr. del Valle had left him in Cecil College in June 1888, does not establish any presumption that he continued there indefinitely. Even conceding that such presumption existed, the same was overcome by the evidence of the plaintiff to the effect that Planellas was in Cayey subsequent to June 1888, had a love affair with Eduvigis Díaz, left her pregnant, and again went to the United States. Dr. del Valle's testimony does not contradict that of Eustaquia Vázquez and Sotero Colón as to the fact that Planellas was in Cayey, had a love affair with Eduvigis Díaz, left her pregnant, and again removed to the United States. Nor does the testimony of Francisco del Valle and Antonio Pereira, witnesses for the defendants, contradict the statements of the above-mentioned witnesses for the plaintiff, and the former witness confined himself to the assertion that he knew Planellas more intimately after he returned from the United States and after he had married when he lived in the Condado in the year 1906; the latter stated that he met him in 1884, that in 1886 he bade him farewell, and that he did not see him again until 1890 in Trujillo Alto.

■ There is nothing in the evidence for the defendants which would tend to discredit the testimony of Eustaquia Vázquez and Sotero Colón. Their testimony as to the love affair between Planellas and Eduvigis was not contradicted in any way and should have been accorded credit by the lower court, since the version given by them was not physically impossible, or improbable, nor did they incur in any contradiction rendering them unworthy of credit. *Navarro v. Compañía Azucarera "El Ejemplo"*, 53 P.R.R. 692; *Caballero v. González*, 53 P.R.R. 513. In the opinion which the lower court rendered in support of its judgment, the only thing that it said regarding this aspect of the case is as follows:

"The parties stipulated, and it is so stated in the record, that the plaintiff was born in the town of Cayey, at 8 o'clock in the evening of September 30, 1889, and that said date could be ascertained from the testimony of Eustaquia Vázquez. Sotero Colón also testified as to the birth, although he contradicted the testimony of Eustaquia Vázquez as to the date of the marital relations between Manuel Planellas Muñoz and Eduvigis Díaz.

"* * * * * * *

"The plaintiff lays great emphasis on the doctrine established by the Supreme Court in the case of *Colón v. Heirs of Tristani*, 44 P.R.R. 163, as to the liberal tendencies which that doctrine favors in actions of filiation. Once the existence of sexual relations has been established, the legal presumption of paternity arises and it would be an unjust law that 'in which after the existence of a father is shown the means are not given to compel him to assume the responsibilities contracted with the child by him engendered. We fully agree; but in this case which we are discussing, regardless of how broad and liberal the mind of the judge may be, *the date of the birth of María can not be accurately determined; and, furthermore, there is a great conflict as to whether on the supposed date on which she is alleged to have been born the father was in Puerto Rico,* since the evidence must be considered in all its parts by the judge, without capriciously disregarding some evidence in order to give effect to a particular testimony which may favor the theory of the plaintiff. It is unnecessary that I should make a complete analysis of all the evidence." (Italics ours.)

From the examination we have made of the testimony of Eustaquia Vázquez and Sotero Colón which we have already summarized, the conflict referred to by the lower court does not appear. The Vázquez woman stated that Eduvigis Díaz, the mother of the plaintiff, and Planellas had a love affair, as a result of which the plaintiff was born about the time of the death of Baldorioty in September 1889; and Sotero stated that in 1888 and 1889 Planellas lived in concubinage with Eduvigis Díaz, first in a house which he furnished for her in the suburbs at the entrance of the public road leading to Cidra and then in another house which he provided in front of a bakery. It can not be maintained that the date of plaintiff's birth was not accurately fixed. Nor is there what the lower court calls "a great conflict as to whether on the supposed date on which she *was born* the father was in Puerto Rico." It is an admitted fact that Planellas was not in Puerto Rico when the plaintiff *was born* and, as we stated before, the defendants did not contradict the evidence of the plaintiff as to his presence here from June 1888 to the beginning of 1889. Moreover the defendants by introducing Eustaquia Vázquez and the plaintiff as their own witnesses are precluded from impeaching them on the mere ground of interest. *Morales et al.* v. *Díaz et al.*, 24 P.R.R. 691; *Quintana* v. *Lejeune,* 37 P.R.R. 682.

We are of opinion that the existence of the love affair between Planellas and Eduvigis Díaz was proved. The fact that the plaintiff was born while Planellas was in the United States in September 1889, lacks importance. The 11th Law of Toro, *supra,* did not require that at the time of the conception or birth of the child, the father should be living with the mother, but only that they could have married without dispensation; and here it was proven that they were unmarried. Nor did it require that the mother should have lived in the same house with the father nor that he should have had only one woman, although the fact that they had lived in concubinage does not render said law inapplicable.

As we have seen from the above-cited authorities, the law makes an acknowledgment unnecessary or, as Llamas y Molina states, "such an acknowledgment is not required."

But in the case at bar there were proved, in our judgment, acts of express acknowledgment on the part of Planellas which establish plaintiff's status as his natural daughter. The first act relates to his having gone to Cayey to get her and take her to Trujillo Alto. The lower court, referring to this important point, in its brief opinion, says:

"Conceding for the sake of argument that María Díaz is the same person who, according to the testimony of Eustaquia Vázquez, was born in Cayey, the question which arises and which creates in the mind of the judge a certain uneasiness respecting its determination, is the one very properly raised by the defendants, when they ask in their brief, to wit: Who brought the child from Cayey to Trujillo Alto?

"According to the witnesses for the plaintiff, it was Planellas himself who brought her, and according to the witnesses for the defendants, it was Pablo Monge. Now, then, neither the testimony of these witnesses who referred to the trip of María from Cayey to Trujillo Alto, nor the very testimony of Ramón Monge satisfy the conscience of the judge to such an extent as to enable him to determine with absolute certainty how María arrived in Trujillo Alto. This, it may be said, is one of the lagoons which this evidence contains and which has caused me to speculate the most, *without my being able to reach a correct and definite conclusion thereon*, despite the fact that I have read several times the testimony of the witnesses, and have followed with interest the analysis of the evidence as made by the parties in their well-prepared briefs." (Italics ours.)

A serene analysis of the evidence introduced suffices to conclude that it is indeed possible to give a correct answer to the question which the lower court asked itself. Against the direct evidence given by the witnesses for the plaintiff, Eustaquia Vázquez, Regino Rivera, Sotero Colón, and Matías Hernández, who asserted that it was Planellas who went to Cayey to get the girl and who brought her to Trujillo Alto and left her for some months in the house of José Asencio

(husband of Matías Hernández), taking her afterward to the house of defendant's mother and then to his own house, there was only the testimony of Ramón Monge, who stated that it was his brother Pancho who brought her to Trujillo and then turned her over to Asencio. This testimony of Monge, not only is in open conflict with that of the witnesses for the plaintiff, but fails to offer any logical explanation of the reason which his brother Pancho, a professional gambler, had for bringing the girl to Cayey; who was she, where did he take her from, why did he turn her over to Asencio, etc. During the lengthy cross-examination to which he was subjected, Ramón Monge generally answered that he did not remember or that he did not know. His testimony indeed does not create a good impression, and when we cómpare it with the logical explanation given by the witnesses for the plaintiff as to the fact that it was Planellas, as her father, who went to Cayey in order to get the girl and bring her to Trujillo Alto, we must agree with the plaintiff that the lower court committed manifest error in weighing the evidence regarding this particular, as well as that relating to the love affair, as we have already shown. It was mainly on the basis of those two aspects of the case that the lower court rendered judgment for the defendants. The only thing that it says in its opinion regarding the remaining portion of the evidence introduced, which relates to the years during which the plaintiff lived in the house of Planellas at different times, is the following:

"There is nothing in this evidence to show that Manuel Planellas was a man who avoided his obligations, and no explanation can be perceived for the conduct of a man who—conceding the fact of his trip from Cayey to Trujillo Alto to get his daughter—*should perform the acts which the plaintiff attributes to him when he lost his son, and should adopt a nephew of his wife, absolutely disregarding his daughter María,* and what is still more serious, should have taken the latter to live in the very house of his newlywed wife, and that his wife should become aware of his parental relations with

María. The whole of this evidence seems extremely suspicious to me, and fails to leave in my mind the moral certainty satisfying the conscience of the judge.'' (Italics ours.)

The fact that Planellas had adopted the nephew of the defendant in *1920*, as the defendant herself testified, could not affect in any way the solution of the problem involved in this case; that is, whether Planellas over 30 years before that time, had a love affair with Eduvigis Díaz as a result of which the plaintiff was born, and whether or not Planellas carried out any acts of express or implied acknowledgment of his daughter. Nor is the fact that the plaintiff had been brought to live in the house of the newlywed defendant, sufficient to refuse to accord any credit to the evidence of the plaintiff, when we observe that, according to the certificate of marriage of the defendant, the latter was 15 years of age when she married. Besides, Planellas had already performed some acts of acknowledgment and he had also executed others prior to the death of the son born out of the defendant's union with Planellas.

There is nothing in the 11th Law of Toro which would require that more than one act of acknowledgment should have been performed by the father in order to enable the court to decide that the status of an acknowledged natural child had been established. Its provisions are so liberal that they admit either an express or an implied acknowledgment. The action of Planellas in going to Cayey to get his daughter and bring her to Trujillo Alto constitutes in itself a sufficient act of acknowledgment. But the evidence showed, in our judgment, many more acts of acknowledgment throughout the years, before as well as after the plaintiff had gone to live with her father. The case before us is not one calling for proof that the child has been in the uninterrupted possession of the status of a natural child justified by the conduct of the father, as provided by Section 125 of the Civil Code in force. However, in the case of *Colón* v. *Heirs of Tristani,* 44 P.R.R.

163, 174, which involved the said legal provisions, this court held that the interpretation to be given to the word "*continuo*" is the following:

". . . *In our opinion, the word 'continuo' (uninterrupted) should be taken to mean a series of acts, a set of facts carried out by the person from whom the acknowledgment is claimed, sufficient, if considered as a whole, to constitute the uninterrupted condition of a natural child. Once these series of acts have been carried out for a reasonable length of time, the father should not be allowed to revoke with his subsequent acts the acknowledgment priorly made by him. . . .*" (Italics ours.)

With reference to the 11th Law of Toro, in the cited case of *Colón* v. *Heirs of Tristani*, it was said:

"In accordance with the law 11 of Toro, acknowledgment could be express or implied. The child could investigate his origin, all legal means of evidence to establish his paternity being permissible."

And applying the doctrine that should prevail when the paternity may be investigated, at page 175, it was said:

". . . But when the natural condition of the child may be established *by evidence of his paternity,* once the trial court considers that this fact is proved, *judicial discretion should be humane, judicious and liberal, without going beyond the limits of the law, in order that the natural child may find feasible the way to make effective the duties contracted by his father of acknowledging him once the child is engendered and to demand the rights inherent to his filiation. Paternity is an element which may not be ignored by the trial judge, when evidence to that effect has been presented, in order to reach a conclusion. . . .*"

We are of opinion that, as the lower court has committed the two errors assigned, the judgment appealed from must be reversed and substituted by the one which should have been rendered by said court, sustaining the complaint and as a consequence declaring the plaintiff María Planellas Díaz an acknowledged natural daughter of Manuel Planellas Muñoz, and ordering that such acknowledgment be recorded in the proper civil register, with costs against the defendants.